UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ROHAN HANKERSON,

                Petitioner,                            **MEMORANDUM & ORDER**

         v.                                                   No. 20-CV-282 (RPK)

MARK ROYCE, *Superintendent, Green Haven Correctional Facility*,

                Respondent.
------------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

        Petitioner Rohan Hankerson is serving a state prison sentence after being convicted of multiple crimes—including felony murder—stemming from his participation in a string of armed robberies in Queens in March of 2011. The state appellate court affirmed his convictions on direct appeal. Petitioner now seeks a writ of habeas corpus under 28 U.S.C. § 2254, raising three claims: (1) that the evidence presented at his trial was legally insufficient and the conviction was against the weight of the evidence; (2) that his due-process rights were violated when the prosecution introduced evidence of uncharged crimes; and (3) that his due-process rights were violated when the trial court failed to respond to a jury note saying the jurors were deadlocked. For the reasons set out below, the petition is denied.

## BACKGROUND

### I.    Factual History

        This case arises out of a series of 15 robberies that occurred between March 4 and March 17, 2011 in Queens, New York. Tr. 344 (Dkt. ##9-10–23). Petitioner was charged in connection with four of those robberies, *see ibid.*, and evidence of two others was introduced at his trial. The following facts are taken from the state-court record, viewed in the light most favorable to the prosecution. *See McDaniel v. Brown*, 558 U.S. 120, 133 (2010).

1

### A. Robbery of Shazam and Rabia Mohammed

On March 13, 2011, petitioner was driving near 204th Street and 93rd Avenue in Queens, New York, with co-defendants Ian Green, Corey Brown, and Tiyquon Hodges. At some point, the co-defendants told petitioner to pull the car over, saying that they were "going to get out" and "going to do them"—statements petitioner understood to mean they were going to rob someone. Tr. 592–613, 811–12, 828–29.

Petitioner obliged and the three co-defendants exited the car and approached Shazam and Rabia Mohammed. One co-defendant tackled Mr. Mohammed to the ground and pinned him down; another restrained Ms. Mohammed from behind while the third grabbed her purse. Mr. Mohammed broke free from his assailant and lunged at the two other men, but when he did so, co-defendant Green fired a shot that struck Ms. Mohammed in the stomach. The three men then fled. *Id.* at 566–68. Ms. Mohammed was transported to the hospital and ultimately died. *Id.* at 570–72, 771. Petitioner, who remained in the vehicle during this altercation, drove around the block and waited for the co-defendants to return to the vehicle. When the co-defendants reentered the car, Green reported that "[s]hit got crazy" and that "[he] shot someone." *Id.* at 595–96. The four men then drove off. *Id.* at 596–97.

### B. Robbery of Devendra Seepal and Darmesh Persaud

On March 16, 2011, two men, one of whom was later identified as Ian Green, approached Devendra Seepal and Darmesh Persaud in the vicinity of 129th Street and 97th Avenue in Queens. One of the men pointed a silver firearm at Mr. Seepal and Mr. Persaud; the other man held a black firearm. They robbed the men of $20 and Mr. Seepal's cell phone. *Id.* at 668–673, 777–92.

The next day, petitioner went to a wireless store and sold a cell phone, later identified as Mr. Seepal's, to Malik Almuntaser. *Id.* at 790–96, 802, 1012.

2

### C. Robbery of Paul Goldman

Later on March 17, two men approached Paul Goldman as he was walking on 167th Street in Queens. One man held a gun and demanded Mr. Goldman's property. Mr. Goldman turned over his phone, keys, and a wallet containing cash, a debit card, and a credit card. *Id.* at 855–60. Mr. Goldman's phone was later found in petitioner's vehicle. *Id.* at 682–83, 688, 861–62, 866.

### D. Robbery of Jonathan Savage, Ira Suss, and Lavi Greenspan

A few hours later, at 10:05 P.M. on March 17, three men approached Jonathan Savage, Ira Suss, and Lavi Greenspan near 141st Street and 73rd Avenue in Queens. One of the assailants pointed a chrome firearm. The assailants took money, phones, electronics, keys, and wallets, and fled. Mr. Savage, Mr. Suss, and Mr. Greenspan managed to flag down a passerby and call 911. *Id.* at 881–86.

### E. Robbery of Yakov Matayev

A few minutes later, at 10:20 P.M., three men approached Yakov Matayev on 147th Street in Queens. One of the men pointed a silver firearm at Mr. Matayev. The three men took Mr. Matayev's keys, wallet, and cell phone by force and fled to an SUV, though they dropped the property before entering the car. Mr. Matayev recovered his phone and called 911, and a police vehicle soon arrived. *Id.* at 944–48. Mr. Matayev entered the patrol car and helped the officers search for the SUV, which they soon located a few blocks away. *Id.* at 887–88, 949–51. Police approached the SUV and saw six people inside, including petitioner and co-defendants Hodges, Green, and Brown. Petitioner was seated behind the driver's seat. Brown fled from the vehicle but was apprehended; the others in the vehicle surrendered. Police found a stainless-steel handgun under petitioner's seat. Police also recovered several credit cards from the car, including cards with the names Ira Suss and Lavi Greenspan on them. *Id.* at 910–15, 969–73. The firearm was later determined to be the one used to shoot and kill Rabia Mohammed. *Id.* at 1023–38.

## II. Procedural History

Petitioner was charged with second-degree murder, first- and second-degree robbery, second-degree criminal possession of a weapon, and numerous counts of criminal possession of stolen property in the fourth and fifth degrees. Petitioner was not charged with the robberies of Mr. Goldman or Mr. Matayev, or with possessing Mr. Goldman's phone.

Petitioner went to trial, while his co-defendants each took plea deals. At trial, the prosecution made an application to allow Mr. Goldman and Mr. Matayev to testify about their robberies, and to admit evidence of the recovery of Mr. Goldman's cellphone, relying on *People v. Molineux*, 61 N.E. 286 (N.Y. 1908), a New York case addressing the admissibility of evidence of uncharged crimes. The trial court granted the motions, *see* Tr. 344–48, 694–96, 703–08, 817, but gave limiting instructions. The court told jurors that evidence of Goldman's robbery and cell phone were offered only "on the question of whether the defendant knowingly possessed the stolen property that he is charged with in this indictment" and "must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit robbery or any other charges in this case." *Id.* at 873. The court gave the same two limiting instructions as to the evidence of Mr. Matayev's robbery, but added that that evidence was also "offered to explain the actions of the police leading up to the defendant's arrest." *Id.* at 1110–11.

On the second day of jury deliberations, the jury sent the trial court a note stating: "[W]e are unable to reach a unanimous decision on counts 1, 2, and 3. This is final. No further discussions will change the situation." *Id.* at 1189. The trial court summoned both parties to confer as to how it should respond to the note, but while those discussions were occurring— 46 minutes after the court received the note—the jury sent another note indicating that it had reached a verdict. *See* Pet.'s State Ct. App. Br. 41–46 (Dkt. #9); Tr. 1188–89.

4

Accordingly, the court did not respond to the first jury note and instead called the jury in to take the verdict. Tr. 1189. The jury returned guilty verdicts on one count each of second-degree murder (felony murder) and first-degree robbery, two counts of weapons possession, and ten counts of possession of stolen property. Petitioner was acquitted of charges related to the robbery of Devendra Seepal. *Id.* at 1190–92.

After the jury delivered the verdict, the court polled each juror, and when asked "Is that your verdict?" each juror answered "Yes." *Id.* at 1193–94. Defense counsel objected that the verdict was not voluntary, relying on the jury's note during deliberations indicating that the jury was deadlocked, as well as certain jurors' manner of responding to the polling. Specifically, Juror #3 was asked four times whether the verdict was hers before she finally "whispered yes," and, in defense counsel's view, Juror #7 "seemed to hesitate as well before answering." *Id.* at 1195. The prosecution responded that Juror #7 simply "didn't realize [the court was] addressing her" and "answered right away" once she did. *Ibid.* And in the prosecution's view, Juror #3's "hesitation was because she was choked up" and "emotional, as some jurors are when they have to render a verdict in a serious case." *Ibid.* Defense counsel requested that the court make "further inquiry" into these jurors' thinking. *Ibid.* The trial court denied the request because, despite their hesitation, both jurors had clearly answered the court's question "yes." *Id.* at 1196.

For the crimes that resulted in convictions, the court sentenced petitioner to an aggregate term of 42 years to life in prison. *See* Sentencing Tr. 14–17 (Dkt. #9-23).

Petitioner appealed, arguing that the verdicts were against the weight of the evidence and that the trial court violated his due process rights when it allowed the prosecution to offer evidence of uncharged crimes and refused to conduct an inquiry into the unanimity of the jury's verdict. He also argued that his sentence was excessive. *See generally* Pet.'s State Ct. App. Br.

5

In 2018, the state appellate court affirmed petitioner's convictions. It held that (1) the jury's verdict "was not against the weight of the evidence"; (2) the admission of evidence of uncharged crimes was proper because "the probative value of that evidence outweighed the risk of prejudice to the defendant" and "the court's limiting instruction to the jury served to alleviate any prejudice from the admission of that evidence"; and (3) "[t]he defendant's claim that the jury's verdict should not have been accepted without inquiry is without merit." *People v. Hankerson*, 86 N.Y.S.3d 146, 147–49 (App. Div. 2018). But the court reduced defendant's sentence to an aggregate term of 35 years to life after finding the trial court's sentence excessive. *Id.* at 147–48.

The New York Court of Appeals denied petitioner's application for leave to appeal on January 8, 2020. *People v. Hankerson*, 121 N.E.3d 267 (N.Y. 2019).

Petitioner then filed this timely petition for relief under 28 U.S.C. § 2254. Petitioner contends (1) that the jury's verdict was against the weight of the evidence and that the evidence was legally insufficient to sustain the judgment, (2) that his due process right to a fair trial was denied by the admission of evidence of uncharged crimes, and (3) that the trial court's improper response to the jury verdict likewise violated his due process rights.

## STANDARD OF REVIEW

A person in custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under Section 2254, subject to exceptions not applicable here, a federal court may review a petitioner's claims only if the applicant has exhausted the remedies available to him in the courts of his state. 28 U.S.C. § 2254(b)(1)(A). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii) informed that court (and lower courts) about both the

6

factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of New York*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Federal review of state convictions is circumscribed by the related doctrine of procedural default. "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)) (emphasis omitted). "Out of respect for finality, comity, and the orderly administration of justice," federal courts generally may not entertain such defaulted claims through habeas unless the petitioner shows "cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A state prisoner who fails to make those showings can only receive habeas review if he "advance[s] . . . a credible and compelling claim of actual innocence," *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012)), such that "failure to consider the claim[] will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750.

AEDPA also constrains federal review of claims that have been preserved. So long as a state court adjudicated a litigant's claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"Clearly established Federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (alterations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362,

412 (2000)).  A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.  A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *ibid.*, meaning there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Finally, a determination that a state-court decision was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance," *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quotation marks omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  "If the state record is 'ambiguous' such that two different views of the facts find fair support in the record," AEDPA "mandates deference to the state court's fact-finding." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (citation omitted).

These standards are "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and quotation marks omitted), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,'" not "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Richter*, 562 U.S. at 102–03).

## DISCUSSION

Petitioner has not demonstrated that the appellate division decision affirming his convictions was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an

8

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  Accordingly, the petition is denied.

### I. Weight- and Sufficiency-of-the-Evidence Claims

Petitioner's claims challenging the evidence to support his convictions provide no basis for relief.  Weight-of-the-evidence claims are not cognizable on federal habeas review, and petitioner's sufficiency-of-the-evidence claim lacks merit.

#### A. Weight of the Evidence

Petitioner first renews his argument that the jury's verdict was against the weight of the evidence admitted at trial.  "'Weight of the evidence' claims stem from N.Y.C.P.L. § 470.15(5), which allows an intermediate appellate court to reverse or modify a conviction where the court determines that the verdict was, in whole or in part, against the weight of the evidence, meaning that the 'trier of fact has failed to give the evidence the weight it should be accorded.'" *Nylander v. Smith*, No. 07-CV-457 (SLT), 2010 WL 1292297, at *6 (E.D.N.Y. Mar. 30, 2010).  Accordingly, "the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus" in federal court.  *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011); *see Correa v. Duncan,* 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (explaining that, because "a 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)," federal habeas courts are "precluded from considering [such] claim[s]"); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  Petitioner's claim is not cognizable and is therefore denied.

#### B. Sufficiency of the Evidence

In addition to pressing the weight-of-the-evidence claim he brought in state court, petitioner argues that the evidence presented at trial "was, itself, legally insufficient to sustain the

judgment." Pet. 2 (ECF pagination) (Dkt. #1) (capitalization omitted). Claims that the evidence was insufficient to support a conviction implicate the Fourteenth Amendment's Due Process Clause and are thus cognizable on federal habeas review. *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *McKinnon*, 422 F. App'x at 75.

Assuming *arguendo* that petitioner adequately presented this claim to the state courts for review, *see* Pet.'s State Ct. App. Br. 26–27 (citing constitutional provisions and case law), petitioner's sufficiency argument fails on the merits. "[A] weight-of-the-evidence claim" of the type that the state appellate court rejected "requires more exacting review than an insufficiency claim." *Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012). Accordingly, to the extent that petitioner pressed a sufficiency claim in state court, the appellate division's decision "that [petitioner's] conviction was not against the weight of the evidence . . . necessarily decided that there was sufficient evidence to support the verdict." *Ibid.*

This determination did not reflect an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). A petitioner bringing a sufficiency claim "bears a very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quotation marks omitted). A sufficiency claim can succeed only when, upon "review[ing] the evidence in the light most favorable to the State," it is clear that "no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." *Ibid.* (citing *Jackson*, 443 U.S. at 319). Under that standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel*, 558 U.S. at 133 (quoting *Jackson*, 443 U.S. at 326). Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). This "limited review" ensures that courts "do[] not intrude on the jury's role 'to

10

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).

A "twice-deferential standard" of review applies to sufficiency-of-the-evidence challenges on federal habeas review, *Parker v. Matthews*, 567 U.S. 37, 43 (2012), because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review," *Cavazos v. Smith*, 565 U.S. 1, 7 (2011). Accordingly, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Matthews*, 567 U.S. at 43 (citation and quotation marks omitted).

"When considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime." *Ponnapula*, 297 F.3d at 179 (citation, quotation marks, and alterations omitted). New York law provides that a person is guilty of felony murder when "[a]cting either alone or with one or more other persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime . . . , he, or another participant . . . causes the death of a person other than one of the participants." N.Y. Penal Law § 125.25(3). Accordingly, whether petitioner was guilty of felony murder depends on whether he was guilty of the robbery of Rabia Mohammed that resulted in her death. *See* Tr. 1122–23. Petitioner was charged with that robbery under a theory of accomplice liability. Under New York law, to sustain a conviction for felony murder based on accomplice liability, the defendant must have been more than "merely present" during the commission of the crime—he must instead have "share[d] the intent or purpose of the principal actor" to commit the robbery. *People v. Kaplan*, 556 N.E.2d 415, 417 (N.Y. 1990) (discussing N.Y. Penal Law § 20.00, which "specifies that an accomplice must have acted with the 'mental culpability required for the commission' of the particular crime"); *People v. Miller*, 661 N.E.2d 1358, 1362 (N.Y. 1995) (explaining that

11

robbery requires the intent to "permanently deprive the victim of property by compelling the victim to give up property or quashing any resistance to that act"). But even where a defendant intends to commit a robbery that results in death, New York law provides that it is an affirmative defense to a conviction for felony murder based on that robbery if the defendant "[d]id not commit the homicidal act or in any way solicit [it]," "[w]as not armed with a deadly weapon," "[h]ad no reasonable ground to believe that any other participant was armed with such a weapon," and "[h]ad no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury." N.Y. Penal Law § 125.25(3)(a)–(d).

Here, the appellate division's conclusion that sufficient evidence supported petitioner's felony murder conviction was not "objectively unreasonable." *Matthews,* 567 U.S. at 43. The record contained ample evidence permitting a jury to conclude that petitioner shared the intent of his co-defendants to "permanently deprive [Ms. Mohammed] of property by compelling [her] to give up property." *Miller*, 661 N.E.2d at 1362. Petitioner admitted he was driving with his three co-defendants when they told him to pull over. Tr. 727, 812. One officer testified that petitioner told him that a co-defendant, referring to the Mohammeds, "said to him, hey, look at them." Tr. 595. Another officer—Detective Cvitkovic—testified that petitioner recounted his co-defendants' stating that they were "going to get out" and "do them"—meaning "rob them." Tr. 812. Detective Cvitkovic also testified that, once the co-defendants exited the car, petitioner drove two blocks, made a U-turn, and then "parked at the stop sign and waited" about a block away from where the men had exited his car. *Ibid.* When petitioner saw his co-defendants enter the intersection, "he pulled up to that intersection" and let the men reenter. *Id.* at 813. It was then that the co-defendants informed petitioner that "shit got crazy," "shit got critical," and that defendant Green had "shot someone." *Id.* at 596, 813. Petitioner then drove the men home. *Id.* at 596.

Based on this evidence, a rational jury could conclude that petitioner had grounds to believe his co-defendants intended to commit a robbery when they exited the car, and that he aided in the commission of that robbery by serving as a getaway driver. *See, e.g.*, *People v. Amador*, 642 N.Y.S.2d 27, 28 (App. Div. 1996) (affirming felony murder conviction where "defendant's actions as getaway driver evinced his planned participation in the crime"). What is more, the state presented evidence that, after Rabia Muhammed's murder, petitioner continued to participate in robberies with the same men, lending further support to an inference of petitioner's knowledge of the intent of his co-defendants. *See People v. Ingram*, 522 N.E.2d 439, 442 (N.Y. 1988) ("It is the duplication of the inculpatory conduct which makes the innocent explanation improbable. That defendant was present with his van at *two* gas station robberies, with the same accomplice, within 18 days, casts serious doubt on the assertion that his presence at *either* crime scene was innocent."). To the extent petitioner contends that the jury should not have credited Detective Cvitkovic's testimony, *see* Pet.'s State Ct. App. Br. 32, that claim goes to not to the "legal sufficiency [of that evidence] but rather to the weight it should be given—an issue that is not cognizable on habeas review." *Olivo v. Graham*, No. 15-CV-9938 (VB) (AEK), 2021 WL 3272080, at *7 (S.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, 2021 WL 3271833 (S.D.N.Y. July 30, 2021); *see Schlup*, 513 U.S. at 330 (explaining that "the assessment of the credibility of witnesses is generally beyond the scope of [sufficiency] review").

All of this evidence supports the inference that petitioner was more than "merely present" for the robbery of Rabia Mohammed and instead "share[d] the intent or purpose of the principal actor[s]" to rob her. *Kaplan*, 556 N.E.2d at 417. And petitioner has never invoked—either at trial, on direct appeal, or in his habeas petition—the affirmative defense contained in Section 125.25(3). On this record, it was not "objectively unreasonable" for the appellate division to conclude that

13

there was sufficient evidence to convict petitioner of felony murder on a theory of accomplice liability. *Matthews*, 567 U.S. at 43. Petitioner is not entitled to relief on this basis.

## II.   Evidence of Uncharged Crimes

Petitioner next argues that the admission of testimony about the robberies of Mr. Goldman and Mr. Matayev—crimes with which petitioner was not charged—under *People v. Molineux,* 61 N.E. 286 (N.Y. 1901), violated the Due Process Clause by denying him a fair trial. Pet. 7. This claim also fails.

In New York, *Molineux* authorizes the admission of evidence of other bad acts of a criminal defendant "to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan . . . ; [or] (5) the identity of the person charged with the commission of the crime on trial," 61 N.E. at 293, and more generally when "the probative value of the evidence outweighs its potential for prejudice," *People v. Ventimiglia*, 420 N.E.2d 59, 62 (N.Y. 1981) (adding that *Molineux*'s listing of permissible uses of prior-act evidence is "not exhaustive"). The trial court admitted evidence of the robberies of Goldman and Matayev "on the question of whether the defendant knowingly possessed the stolen property that is charged in th[e] indictment" and to "explain the actions of the police leading up to the defendant's arrest." Tr. 1110–11; *see id.* at 873. Reviewing for abuse of discretion on direct review, the appellate division here concluded that the trial court "providently exercised its discretion" in admitting this evidence. *Hankerson*, 86 N.Y.S.3d at 149.

The appellate division's decision, as the "last reasoned state court decision to address petitioner's challenge to [the] admission of evidence of [the uncharged robberies]," *Rembert v. Annucci*, No. 16-CV-7490 (CS) (PED), 2020 WL 7043616, at *11 (S.D.N.Y. Dec. 1, 2020), is entitled to AEDPA deference. That decision was not an unreasonable application of, or contrary to, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

To begin with, claims about the admissibility of evidence, like weight-of-the-evidence claims, are issues of state law that are generally not cognizable on collateral review. *Estelle*, 502 U.S. at 67–68 (explaining that the question whether certain "evidence was incorrectly admitted . . . pursuant to [state] law . . . is no part of a federal court's habeas review of a state conviction"); *see Lisenba v. California*, 314 U.S. 219, 228 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."). Still, the Supreme Court has suggested that relief under Section 2254 may be appropriate if a state-court evidentiary ruling "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75 (quoting *Lisenba*, 314 U.S. at 228). The cases fall in two buckets. First, *Estelle* suggested—but did not affirmatively decide—that it may in some circumstances violate due process "for evidence that is not relevant to be received in a criminal trial." *Id.* at 70. But that principle cannot aid petitioner because the disputed evidence here—the testimony of Mr. Matayev and Mr. Goldman about the uncharged robberies—"was at least arguably relevant" to the issue of petitioner's knowledge of the stolen property he was charged with possessing, "and even assuming there was error, the evidence was not so extremely unfair that its admission violated fundamental conceptions of justice." *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (citation, quotation marks, and alterations omitted).

A second set of cases suggests that an "erroneous" state evidentiary ruling could render a trial fundamentally unfair if the evidence admitted as a result, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *see Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (same); *see also Vega*, 669 F.3d at 126. To succeed on such a claim, the erroneously admitted evidence "must have been 'crucial, critical, [and] highly significant.'" *Collins*, 755 F.2d at 19 (quoting *Nettles v.*

15

*Wainwright*, 677 F.2d 410, 414–15 (5th Cir. 1982)). Even assuming the uncharged-crimes testimony should have been excluded under a proper application of *Molineux*, petitioner cannot make the required showing of materiality. Petitioner was charged with criminal possession of various pieces of stolen property—Mr. Seepal's cell phone, Tr. 1133; two of Mr. Suss's credit cards and his wallet, *id.* at 1138, 1141, 1142; and five of Mr. Greenspan's credit cards, *id.* at 1141. There was ample evidence to prove that petitioner knowingly possessed each of these items. Testimony showed that petitioner sold Mr. Seepal's cell phone to a wireless store the day after the robbery. *See id.* at 790–96, 802, 1012. And police recovered the wallet and each of the credit cards (as well as the gun that killed Ms. Mohammed) from the car petitioner and several of his co-defendants were in at the time of their arrests. *See id.* at 910–15, 969–73, 1023–28. Against the backdrop of this evidence, the testimony of Mr. Matayev and Mr. Goldman cannot be said to have been "crucial, critical, [and] highly significant" to the state's case against petitioner. *Collins*, 755 F.2d at 19. Accordingly, the appellate division did not run afoul of clearly established federal law when it affirmed the trial court's admission of this evidence under *Molineux*.

### III.     Trial Court's Response to the Jury Verdict

Finally, petitioner argues that the trial court also denied him a fair trial when it improperly responded to a note indicating that the jury was deadlocked and then failed to question jurors during polling when two jurors were hesitant in their answers. Pet. 8. To the extent that petitioner presses a claim based on New York state constitutional and statutory provisions requiring jury unanimity and jury polling—as petitioner principally did on direct appeal—those claims cannot serve as a basis for federal habeas relief. *See McGuire*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

And to the extent petitioner argues that this conduct violated petitioner's "fed[eral] constit[utional] rights to a unanimous jury verdict [and] due process of law," Pet. 8 (capitalization

16

altered), this claim fails as well. The right to a unanimous jury verdict was not "clearly established Federal law" for purposes of Section 2254 until *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Ramos* "does not apply retroactively on federal collateral review," *Edwards v. Vannoy*, 141 S. Ct. 1547, 1552 (2021). So petitioner cannot obtain habeas relief based on his jury unanimity claims.

Petitioner's claims that the trial court's actions resulted in a denial of due process fare no better. It is clearly established law that under the Due Process Clause, "[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Accordingly, a trial court's coercing a jury to return a conviction could warrant relief under Section 2254. *See Johnson v. Poole*, 02-CV-5348 (JSM), 2003 WL 118505, at *3 (S.D.N.Y. Jan. 14, 2003) ("The Supreme Court's opinions in *Allen* [*v. United States*, 164 U.S. 492 (1896),] and *Lowenfield* clearly establish the general principle that a charge that is unduly coercive can deprive a defendant of due process."). But petitioner has pointed to no coercive action by the court. Instead, petitioner suggests that the trial judge denied him due process by failing to respond to the jury's note suggesting they were deadlocked, after the jury returned another note indicating that they had in fact reached a verdict. But no Supreme Court case clearly establishes that a court must provide further instructions, or conduct further inquiry, when a jury returns a unanimous verdict after previously stating that it was deadlocked. And where a "petitioner's claim requires [a federal court] to apply a rule of law that was not clearly established Federal law as determined by the Supreme Court at the time of the state court determination, Section 2254(d)(1) bars relief." *Vasquez v. Strack*, 228 F.3d 143, 148 (2d Cir. 2000). Petitioner's claims relating to the jury verdict therefore cannot support relief under Section 2254.

## CONCLUSION

The petition is denied. Because petitioner has not shown "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues

presented were 'adequate to deserve encouragement to proceed further,'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)), a certificate of appealability under 28 U.S.C. § 2253(c)(2) is also denied.  In addition, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated:   June 7, 2023
         Brooklyn, New York